## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
## READING DIVISION

| | | |
|---|---|---|
| **IFS INDUSTRIES, INC.,** | § | Case No. |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| **TAILORED CHEMICAL PRODUCTS,** | § | |
| **INC. and KEVIN J. RODECK,** | § | |
| | § | |
| *Defendants.* | § | |

### COMPLAINT

Plaintiff, IFS Industries, Inc. ("Plaintiff" or "IFS"), for its Complaint against Defendants Tailored Chemical Products, Inc. ("Tailored") and Kevin J. Rodeck ("Rodeck") (collectively "Defendants"), alleges as follows:

### Nature of the Action

1.      This is an action for breach of contract, tortious interference with contract, breach of fiduciary duty under Pennsylvania law, and misappropriation of trade secrets under Pennsylvania and federal law, (the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5301 *et seq.*; the Defend Trade Secrets Act of 2016 18 U.S.C. § 1836 *et seq.*).

### The Parties

2.      IFS is a Pennsylvania-based adhesives company.  IFS develops and manufactures innovative adhesives and coatings for industrial, contractor, and do-it-yourself customers in interstate commerce and worldwide.  IFS's principal place of business is at 400 Orrton Avenue, Reading, Pennsylvania, 19603.  IFS is incorporated under the laws of the Commonwealth of Pennsylvania.

3.     Tailored is a direct competitor of IFS.  Tailored competes with IFS in the markets for water-based adhesives, hot-melt adhesives, and polyurethane adhesives, as well as custom versions of these adhesives, among other products.  Tailored is a North Carolina corporation with its principal place of business at 700 12th Street Drive NW, Hickory, North Carolina, 28601.

4.     Rodeck is a former employee of IFS and current employee of Tailored.  IFS employed Rodeck from approximately August 16, 1993 to April 13, 2018.  Tailored began employing Rodeck on or before May 1, 2018.  On information and belief, Rodeck currently is domiciled in North Carolina.

## Jurisdiction

5.     This is a civil action arising in part under the laws of the United States.  The Court has original jurisdiction over IFS's federal claims under 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over IFS's Pennsylvania claims under 28 U.S.C. § 1367(a).

6.     The Court also has jurisdiction over all of IFS's claims under 28 U.S.C. § 1332 because this matter involves a controversy between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

7.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to IFS's claims occurred in this District, including Rodeck's employment with IFS, Rodeck's obtaining trade secret information during his employment with IFS, and Tailored's recruiting Rodeck while he was an employee at IFS.

8.     The Court has personal jurisdiction over Rodeck at least because IFS's claims arise out of Rodeck's transacting business in, and causing harm or tortious injury by acts or omissions in Pennsylvania.  Rodeck resided in Pennsylvania and worked for IFS in Pennsylvania from 1993 to 2018.  IFS's contract claim pertains to Rodeck's employment agreement, entered into with IFS in Pennsylvania.  IFS's trade secret claims pertain to trade secret information

obtained by Rodeck during and because of his employment with IFS in Pennsylvania. Similarly, IFS's breach of fiduciary duty claim pertains to actions taken by Rodeck during his employment with IFS in Pennsylvania.

9.     The Court has personal jurisdiction over Tailored at least because IFS's claims arise out of Tailored's transacting business in, and causing harm or tortious injury by acts or omissions in Pennsylvania. Before competing with IFS in the market for adhesive products, Tailored was a customer of IFS in Pennsylvania, purchasing, among other things, polyalphaolefin-based hot melt adhesives. Tailored subsequently recruited and hired Rodeck, then a citizen of Pennsylvania, to work for Tailored in the area of adhesive products. Tailored expressly aimed its conduct at Pennsylvania, as IFS experienced the brunt of the harm of this action in Pennsylvania.

### Factual Background

10.     Rodeck began working for IFS in 1993 as a Territory Manager. In that position, Rodeck's responsibilities included gaining new customers for IFS and servicing existing ones. At the time he left the company, Rodeck's title was Vice President, with responsibility for IFS's network of distributors.

11.     Rodeck's employment with IFS was governed by a Confidential Information and Non-Solicitation Agreement ("Agreement") executed on or about August 16, 1993 (Ex. A). Section 3 of the Agreement provides that Rodeck "will not duplicate, remove, transfer, disclose or utilize, nor knowingly allow any other person to duplicate, remove, transfer, disclose or utilize," any IFS information falling within the Agreement's definition of "Confidential Information." *Id.* at 4. Section 6 of the Agreement provides that Rodeck will not "contact or solicit business from, or maintain or service the account of, any client or customer…of IFS or any person who refers clients or customers to IFS" for a period of two years after the termination

of his employment ("Restricted Period"). *Id.* at 8. Section 6 of the Agreement provides that Rodeck will not "assist [Rodeck's] successor employer or any other entity in employment solicitation or recruiting any employee who had worked for IFS during any time when [Rodeck] worked for IFS." *Id.* at 9. Section 8(c) of the agreement provides that Rodeck acknowledges that IFS "will suffer irreparable injury and damage" if Rodeck violates any of his obligations under the Agreement. *Id.* at 10. Section 8(c) further provides that "IFS will be entitled to equitable relief (including but not limited to injunctions and accountings) against [Rodeck] to prevent a breach of this Agreement or any part of it, and to secure its enforcement." *Id.* at 10. Section 10 provides that Rodeck's obligations under the Agreement, including his confidentiality obligations, survive termination of his employment with IFS. *Id.* at 11.

12.     In the Agreement, Rodeck acknowledged that his employment at IFS would cause him to be exposed to IFS's confidential information and trade secrets, "including but not limited to technical information such as formulas, processes, programs, designs and know-how," as well as "non-technical business information such as client information, customer lists, marketing programs and financial matters." *Id.* at 1.

13.     In the course of his employment at IFS, Rodeck accessed and used confidential and proprietary trade secret information regarding IFS's adhesives, including chemical formulae, ingredient names, suppliers and specifications, manufacturing processes, as well as business strategies, sales strategies, and customer and pricing information, among many other things.

**Rodeck Misuses Company Resources and Leaves IFS**

14.     On information and belief, at some point during Rodeck's employment with IFS, Tailored began to recruit Rodeck to leave IFS and enter the employ of Tailored.

15.     On or about March 27, 2018, while still employed by IFS, Rodeck traveled from Pennsylvania to North Carolina, returning on or about March 29, 2018. Rodeck paid for his

4

airfare using an IFS company credit card billed to IFS.  On information and belief, Rodeck's travel to North Carolina was for the purpose of interviewing with Tailored.

16.     Tailored and Rodeck eventually reached an agreement that Rodeck would leave IFS and join Tailored to serve as its Technical Director.  Rodeck gave IFS notice of his resignation on or about April 11, 2018, effective on or about April 13, 2018.

17.     At the time it recruited and hired Rodeck, Tailored knew or had reason to know that Rodeck was domiciled in Pennsylvania.

18.     At the time it recruited and hired Rodeck, Tailored knew or had reason to know that Rodeck's position at IFS afforded him access to IFS confidential information and trade secrets.

### Rodeck Retains Confidential Information

19.     During his employment with IFS, Rodeck regularly took to his home or on business trips a specific manila or plastic folder containing hand-written copies of IFS formulae. This folder with formulae was never found at Rodeck's workstation.  Nor was the folder in a box of IFS materials that Rodeck returned, at IFS's persistent request, after he left the company.

20.     Upon information and belief, Rodeck gave Tailored access to this folder of formulae.  As a result, Tailored has begun or will soon begin selling IFS adhesives, competing for sales with IFS's customers and others, and profiting as a result.

21.     While employed at IFS, Rodeck used a company-issued laptop and phone.  After leaving the company, Rodeck initially did not return the phone, and only did so after being contacted, through Rodeck's counsel, by IFS attorneys.  Even after Rodeck returned the phone, subsequent analysis revealed that he had erased the data stored on it.

22.     After his employment with IFS ended, Rodeck removed or failed to return IFS-issued electronics and documents containing IFS confidential information and trade secrets.

**Rodeck and Tailored Solicit IFS Customers**

23.     While at IFS, Rodeck developed and maintained relationships with several IFS customers.  Now that Rodeck is employed by Tailored, Rodeck and Tailored are working to take from IFS the business of those same customers.

24.     For example, Rodeck contacted an IFS customer, Baker/Titan Adhesives Co. ("Baker/Titan").  Baker/Titan buys a substantial amount of adhesives from IFS annually.  On August 21, 2018, Anthony Bucco ("Bucco"), the President of Baker/Titan, left a message on Rodeck's old voicemail at IFS, mistakenly believing that Rodeck still used it.  On the voicemail, Bucco said that Rodeck had spoken to him "about a week ago," and had offered to sell him a very inexpensive metallocene adhesive (a kind of hot melt adhesive that Baker/Titan had previously ordered from IFS).  Bucco asked Rodeck for pricing and samples of the adhesive that Rodeck had offered.

25.     Tailored is attempting to win IFS's business with Sonoco Products Co. ("Sonoco").  Sonoco distributes adhesives to various industries and purchases certain types of adhesives itself for its own use in the packaging industry.  Sonoco has been a customer of IFS for approximately ten years, and buys a substantial amount of adhesive products from IFS every year.  Sonoco was a customer of IFS during Rodeck's tenure, and Rodeck developed, maintained, and serviced IFS's relationship with Sonoco.  IFS learned that after Rodeck went to work for Tailored, Tailored was in contact with Sonoco to solicit its business.

26.     Rodeck is in contact with or soliciting Sonoco on behalf of Tailored, in violation of his Agreement.  For instance, IFS learned that Rodeck had been in communication by email with Sonoco employees within a week or two of the time he left IFS.  Additionally, a Sonoco

6

representative communicated with Rodeck about having Tailored replace IFS as its supplier for a specific adhesive.

27.     Tailored also is attempting to win IFS's business with HAR Adhesive Technologies, Inc. ("HAR"). HAR sells adhesives and equipment to the bookbinding, woodworking, and packaging industries, among others. HAR has been a customer of IFS for approximately 20 years, and buys a substantial amount of adhesive products from IFS every year . HAR is not a customer of Tailored. Through his work for IFS, Rodeck came to know HAR's corporate leadership and developed, facilitated, maintained, and serviced IFS's relationship with HAR. IFS learned that after Rodeck went to work for Tailored, Tailored reached out to HAR to solicit its business.

28.     Upon information and belief, Rodeck is contacting and/or soliciting HAR on behalf of Tailored, in violation of his Agreement.

29.     Tailored also is attempting to win IFS's business with Adhesive and Equipment, Inc. ("A&E"). A&E represents itself as a leading manufacturer and distributor of hot melt adhesive parts and equipment. A&E has been a customer of IFS for approximately ten years, and buys a substantial amount of adhesive products from IFS every year. A&E has never been a customer of Tailored. Rodeck attended several meetings with A&E while an employee of IFS. IFS learned that after Rodeck went to work for Tailored, Tailored reached out to A&E to solicit its business.

30.     Upon information and belief, Rodeck is contacting or soliciting A&E on behalf of Tailored, in violation of his Agreement.

31.     Tailored also is attempting to win IFS's prospective business with American Air Filter Company, Inc. ("American Air Filter"). American Air Filter manufactures air filters for homes, offices, and factories to control dust, eliminate odors, and protect particle-sensitive

machines.  IFS has been winning an increasing share of American Air Filter's business for adhesives over the past several years.

32.     In the months prior to Rodeck's departure, IFS appeared increasingly likely to win American Air Filter's business for water-based adhesives, the majority of which are supplied by Tailored in bulk tanker trucks.  It appeared that IFS would supplant Tailored for a number of reasons: IFS had conducted several trials using IFS adhesives at American Air Filter's production plants; IFS went through an industry certification process for IFS adhesives; and American Air Filter preliminarily converted one of its facilities to use IFS's adhesives.

33.     Before American Air Filter could begin ordering IFS's water-based adhesives in earnest, an increase in raw material and shipping prices forced IFS to raise its prices.

34.     Following IFS's price increase, American Air Filter halted its transition to IFS for water-based adhesives, and said that it would remain with its incumbent supplier, Tailored, whom American Air Filter said had kept its prices constant.  This was surprising, because Tailored would have been affected by the same increase in raw materials.  It is also surprising because it is not customary for customers to share adhesive suppliers' pricing information.

35.     IFS's pricing strategy for American Air Filter was confidential within IFS, and Rodeck was one of a handful of people to know it.  Upon information and belief, Rodeck shared information with his new employer, Tailored, about IFS's plans to win increasing business from American Air Filter.

36.     Upon information and belief, Rodeck shared with Tailored confidential information about IFS's business plans for American Air Filter, and Tailored used that information to match IFS's prices for American Air Filter.  This was in violation of Rodeck's Agreement.

37.     All these companies—Baker/Titan, Sonoco, HAR, A&E, and American Air Filter—are current IFS customers.  Rodeck contacted Baker/Titan and Sonoco, and upon information and belief, facilitated Tailored's contact with HAR, A&E, and American Air Filter, all in violation of his Agreement.

38.     Upon information and belief, Rodeck is also using IFS's confidential information about IFS adhesives to grow Tailored's business with these and other customers.

**Rodeck Solicits IFS Employee**

39.     After leaving IFS, Rodeck solicited the employment of IFS employee Steve Chorney ("Chorney") in violation of Rodeck's Agreement.

40.     Chorney is currently an independent contractor for IFS, but before August 1, 2018 he was an employee Sales Representative.  After joining Tailored, Rodeck repeatedly called Chorney while Chorney was still an employee for IFS.  Chorney ignored most of these calls. When he finally responded, Rodeck invited Chorney to come work for him at Tailored.  Chorney declined the invitation.

**COUNT I (Against Defendant Rodeck)**
**BREACH OF CONTRACT**

41.     IFS repeats the allegations of Paragraphs 1-40 as if fully set forth herein.

42.     The Agreement between Rodeck and IFS is a valid, binding, and enforceable contract.

43.     The Agreement contains restrictive covenants not to copy, remove, use, or disclose IFS's confidential information, as well as restrictive covenants not to solicit IFS customers or employees.  These are enforceable because they were ancillary to Rodeck's employment, are reasonably limited in scope, and do not impose undue hardship on Rodeck. Further, their enforcement is necessary to protect IFS's legitimate business interests.  In

particular, it was important that IFS not give Rodeck training, connections, and confidential information, only to have him leave for another company.

44.     Rodeck violated his obligations under the Agreement by soliciting an IFS employee, Steve Chorney, to work for Rodeck's new employer, Tailored.

45.     Rodeck further violated his obligations under the Agreement by contacting and soliciting IFS customers Baker/Titan, Sonoco, and, upon information and belief, HAR, A&E, and American Air Filter, to purchase products from his new employer, Tailored.

46.     Rodeck yet further violated his obligations under the Agreement by copying, removing, using, or disclosing IFS's confidential information.  During his employment with IFS, Rodeck copied and removed chemical formulae from IFS's premises without authorization. Upon information and belief, he shared this information with Tailored.  Upon information and belief, Rodeck also disclosed IFS's confidential information about American Air Filter to Tailored, allowing Tailored to match IFS's pricing and causing IFS to lose part of its anticipated business with American Air Filter.

47.     Rodeck's employment with Tailored as the company's Technical Director will inevitably cause him to commit further violations of his obligations under the Agreement by further copying, removing, using, or disclosing IFS's confidential information.  Indeed, it will be impossible for him to do his work as Technical Director without relying on his knowledge of IFS's confidential adhesive formulae.

48.     Rodeck's employment with Tailored will inevitably cause him to commit further violations of his obligations under the Agreement by soliciting IFS's customers during the Restricted Period or soliciting IFS's employees to leave IFS and join Tailored.

49.     IFS has suffered and will continue to suffer damages, such as lost sales, as a direct and proximate result of Rodeck's breaches of the Agreement.

50.     As Rodeck conceded in the Agreement, IFS has suffered and will continue to suffer irreparable injury, such as loss of confidential information, loss of prospective customers, loss of employees, and loss of general goodwill, as a direct and proximate result of Rodeck's breaches of the Agreement.  IFS is therefore entitled to equitable injunctive relief to halt Rodeck's breaches of the Agreement and to prevent future breaches.

51.     All conditions precedent to IFS's enforcement of the agreement have occurred or been performed.

52.     As a direct and proximate result of these breaches, IFS suffered damages in excess of $75,000.  IFS is entitled to compensation for these breaches.

## COUNT II (Against Tailored)
## TORTIOUS INTERFERENCE WITH CONTRACT

53.     IFS repeats and incorporates by reference the allegations of Paragraphs 1-40 as if fully set forth herein.

54.     The Agreement between Rodeck and IFS is a valid, binding, and enforceable contract.

55.     The Agreement contains restrictive covenants, including a covenant not to solicit IFS customers or employees and a covenant not to copy, remove, use, or disclose IFS's confidential information.

56.     Tailored knew of the existence of the covenants in the Agreement.

57.     Despite such knowledge, Tailored caused, encouraged, or induced Rodeck to breach the covenants in the Agreement by soliciting IFS employees, helping to solicit IFS customers, and copying, removing, using, or disclosing IFS's confidential information.

58.     Tailored knowingly and intentionally enjoyed the economic benefit of these breaches.

59.     There was no privilege or justification for Tailored's conduct.

60.     By causing, encouraging, or inducing Rodeck to breach the covenants in the Agreement, Tailored tortiously interfered with IFS's rights under those contracts.

61.     IFS has suffered and will continue to suffer damages, such as lost sales, as a direct and proximate result of Tailored's tortious interference.

62.     IFS has suffered and will continue to suffer irreparable injury, such as loss of confidential information, loss of prospective customers, loss of employees, and loss of general goodwill, as a direct and proximate result of Tailored's tortious interference. IFS is therefore entitled to equitable injunctive relief to halt Tailored's tortious interference and to prevent future interference.

63.     As a direct and proximate result of Tailored's interference, IFS suffered damages in excess of $75,000. IFS is entitled to compensation for this misappropriation.

## COUNT III (Against Both Defendants)
## MISAPPROPRIATION OF TRADE SECRETS (Pennsylvania Law)

64.     IFS repeats and incorporates by reference the allegations of Paragraphs 1-40 as if fully set forth herein.

65.     During his employment with IFS, Rodeck had access to IFS's confidential, proprietary, and trade secret information, including without limitation chemical formulae, ingredient names, suppliers and specifications, manufacturing processes, business strategies, sales strategies, and customer and pricing information, among many other things ("IFS Trade Secrets").

66.     As with all adhesives manufactured by IFS, IFS expended time, money, and resources developing and perfecting adhesives for various uses. IFS develops adhesives for specific applications in specific industries, and frequently for specific customers.

67.     The IFS Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, other persons such as Tailored who can obtain economic value from their disclosure or use.

68.     IFS has taken and continues to take reasonable measures to maintain the secrecy of the IFS Trade Secrets, including by prohibiting employees from removing, copying, using, or disclosing the IFS Trade Secrets, as the Agreement prohibited Rodeck from doing.

69.     During his employment with IFS, Rodeck regularly took to his home or on business trips a specific manila or plastic folder containing hand-written copies of IFS formulae. This folder with formulae was never found at Rodeck's workstation.  Nor was the folder in a box of IFS materials that Rodeck returned, at IFS's persistent request, after he left the company.

70.     Rodeck knew or had reason to know that his knowledge of the IFS Trade Secrets was acquired through circumstances giving rise to a duty to maintain its secrecy or limit its use—namely, his employment with IFS, which was governed by the Agreement.

71.     Upon information and belief, Rodeck disclosed IFS Trade Secrets to Tailored without IFS's express or implied consent.  For example, upon information and belief, Rodeck disclosed to Tailored IFS formulae for metllocene adhesives, in order to solicit business from Baker/Titan.

72.     Through his employment at IFS, Rodeck had knowledge of the details of IFS's business with American Air Filter, including pricing and technical information.  Upon information and belief, Rodeck disclosed IFS's confidential information about American Air Filter to Tailored, allowing Tailored to match or beat IFS's pricing and causing IFS to lose part of its anticipated business with American Air Filter.

73.     Rodeck's employment with Tailored will inevitably require him to further use and disclose the IFS Trade Secrets without IFS's consent.

74.      Tailored has acquired and will acquire IFS Trade Secrets from Rodeck, which Tailored knows or has reason to know were acquired by Rodeck through improper means.

75.      Upon information and belief, Tailored is using IFS's Trade Secrets to solicit business from companies like Baker/Titan.  Upon information and belief, Rodeck also disclosed IFS's confidential American Air Filter bid information to Tailored, allowing Tailored to match IFS's pricing and causing IFS to lose part of its anticipated business with American Air Filter.

76.      IFS has suffered and will continue to suffer damages, such as lost sales, as a direct and proximate result of Rodeck and Tailored's misappropriation of the IFS Trade Secrets.

77.      As Rodeck conceded in the Agreement, IFS has suffered and will continue to suffer irreparable injury, such as loss of confidential information, loss of prospective customers, loss of employees, and loss of general goodwill, as a direct and proximate result of Tailored's tortious interference, as a direct and proximate result of Rodeck and Tailored's actual and threatened misappropriation of the IFS Trade Secrets.  IFS is therefore entitled to equitable injunctive relief to halt Rodeck and Tailored's misappropriation and to prevent future misappropriations.

78.      As a direct and proximate result of this misappropriation of trade secrets, IFS suffered damages in excess of $75,000.  IFS is entitled to compensation for this misappropriation.

## COUNT IV (Against Both Defendants)
## MISAPPROPRIATION OF TRADE SECRETS (Federal Law)

79.      IFS repeats and incorporates by reference the allegations of Paragraphs 1-40 and 64-78 as if fully set forth herein.

80.      The IFS Trade Secrets are related to adhesive products used in and intended for use in interstate commerce.

81.      As a direct and proximate result of this misappropriation of trade secrets, IFS suffered damages in excess of $75,000.  IFS is entitled to compensation for this misappropriation.

<u>**COUNT V (against Rodeck)**</u>
<u>**BREACH OF FIDUCIARY DUTY**</u>

82.     IFS repeats and incorporates by reference the allegations of Paragraphs 1-40 as if fully set forth herein.

83.     At all relevant times, Rodeck was employed by IFS as a Vice President and an officer of the corporation, and owed a fiduciary duty to IFS, including a duty of loyalty.

84.     Rodeck breached his duty of loyalty by charging expenses to IFS for his travel to North Carolina to interview with Tailored.

85.     As a direct and proximate result of these breaches, IFS suffered damages in excess of $1,000.  IFS is entitled to compensation for these breaches.

<u>**Prayer for Relief**</u>

**WHEREFORE**, IFS prays for relief as follows:

a.     A preliminary injunction precluding Rodeck from soliciting IFS customers or employees for two years after the termination of his employment with IFS, as required by the Agreement.

b.     A preliminary injunction precluding Rodeck from using or disclosing IFS confidential information, as required by the Agreement.

c.     A preliminary injunction directing Rodeck to return all IFS confidential information to IFS, as required by the Agreement, and to preserve all communications concerning IFS customers or employees since Rodeck left IFS.

d.     A preliminary injunction precluding Tailored from inducing Rodeck to violate the covenants of the Agreement.

e.     A preliminary injunction precluding Tailored from using any IFS confidential information obtained from Rodeck, directing Tailored to return to IFS all IFS

confidential information from Rodeck, and directing Tailored to preserve all communications concerning IFS customers or employees since Rodeck left IFS.

f.   Judgment for IFS and against Rodeck for all damages incurred as a result of Rodeck's breach of contract, tortious interference with contract, breach of fiduciary duty, and misappropriation of the IFS Trade Secrets, including punitive damages, IFS's out-of-pocket fees and expenses, as well as attorneys' fees, costs, and disbursements incurred in having to bring this lawsuit.

g.   Judgment for IFS and against Tailored for all damages incurred as a result of Tailored's tortious interference with contract and misappropriation of the IFS Trade Secrets, including exemplary damages, IFS's out-of-pocket fees and expenses, as well as attorneys' fees, costs, and disbursements incurred in having to bring this lawsuit.

h.   The issuance of an injunction precluding Rodeck from working for Tailored for at least twelve months after the Court's decision on this dispute.

i.   The issuance of an injunction precluding Rodeck from soliciting or directing any other person or entity to solicit any of IFS's customers or employees during the Restricted Period.

j.   The issuance of an injunction precluding Rodeck from using IFS's confidential information or IFS Trade Secrets and requiring him to return the same to IFS.

k.   The issuance of an injunction precluding Tailored from obtaining any IFS confidential information or IFS Trade Secrets from Rodeck.

Dated: September 14, 2018

Respectfully submitted,

Paul G. Nofer (PA I.D. No. 52241)
Jonathan S. Krause (PA I.D. No. 93817)
KLEHR HARRISON HARVEY
  BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569-3287
pnofer@klehr.com
jkrause@klehr.com

Richard M. Martinez
  (pro hac vice motion forthcoming)
Sanjiv P. Laud
  (pro hac vice motion forthcoming)
Brendan Ballou
  (pro hac vice motion forthcoming)
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
rmartinez@jonesday.com
slaud@jonesday.com
bballou@jonesday.com
(612) 217-8800

**Attorneys for Plaintiff IFS Industries, Inc.**

# EXHIBIT A

## CONFIDENTIAL INFORMATION AND NON-SOLICITATION AGREEMENT

THIS AGREEMENT made this _16_ day of _August_ , 1993, by and between IFS INDUSTRIES, INC., a Pennsylvania corporation (hereinafter referred to as "IFS"), and _Kevin J. Rodeck_ , an individual (hereinafter referred to as "Employee").

### BACKGROUND

IFS has offered Employee initial employment with IFS as _Territory Manager_ upon certain terms and conditions.

In connection with Employee's duties, Employee will have access to and/or be provided with, and in some circumstances will prepare and create, confidential and proprietary business information and trade secrets belonging to IFS, including but not limited to technical information such as formulas, processes, programs, designs and know-how, and non-technical business information such as client information, customer lists, marketing programs and financial matters.

As a pre-condition to such initial employment, IFS requires assurance by Employee that Employee agrees that all such confidential and proprietary information belongs to IFS, must be turned over to IFS if created and/or possessed by Employee, and, in addition to the protection provided by applicable law, will be fully protected by agreement as hereinafter provided, and that after the term of employment the Employee will not solicit customers of IFS.

Employee is desirous of accepting the offer of employment and the substantial benefits to Employee flowing from employment by IFS, and as a condition of such employment, Employee is willing to abide by and faithfully observe the obligations of Employee set forth herein.

NOW, THEREFORE, in consideration of such initial employment, and the mutual promises and covenants set forth herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1.    Acknowledgments of Employee.

Employee acknowledges that, in connection with Employee's employment by IFS and in consideration of this Agreement, Employee will receive or will become eligible to receive, substantial consideration, including but not limited to salary and Employee benefits and the opportunity for future advancement at IFS.    Employee further acknowledges that the employment and all benefits and potential benefits to Employee from employment are conferred upon Employee only because and on condition of Employee's willingness to commit best efforts and loyalty to IFS, including abiding by the confidentiality, non-solicitation, and other provisions of this Agreement.

2.    Definition of Confidential Information.

"Confidential Information", including the information referred to in the following sentence, shall mean, for all purposes of this Agreement, all information, whatever its nature and form and whether obtained orally, by observation, from written materials or otherwise, obtained by Employee during or as

-2-

a result of Employee's employment by IFS and relating to any research, technical, manufacturing, business or commercial activities or plans of IFS, whether made or conceived by Employee or otherwise, except such information as is generally available to the public through publication, including but not limited to all formulas, systems, methods, programs, processes, compilations of technical and non-technical information, inventions, discoveries and improvements, designs, drawings, blueprints, software, product ideas, concepts, prototypes, features, techniques, procedures, and all ideas related to actual or anticipated business or research and development of IFS, whether patented or patentable, and business and customer information including but not limited to product announcement dates, marketing objectives and strategies, financial projections, planned product or services offerings, advertising and promotional materials, forms, patterns, lists of past, present or prospective licenses, licensees, clients and customers, and their addresses, needs, personnel, characteristics, and the like, and data prepared for, stored in, processed by or obtained from an automated information system belonging to or in the possession of IFS.  All such information existing as of the date of this Agreement, all such information made or conceived hereafter by or for IFS but not made or conceived by Employee, and all such information made or conceived by Employee as described in paragraph 4 below, shall be included within the meaning of "Confidential Information" for all purposes of this Agreement.

3.   <u>General Covenants and Restrictions Relating To All Confidential Information</u>.

With respect to all Confidential Information Employee agrees that:

(a) IFS is the owner of all Confidential Information with the sole proprietary rights in all Confidential Information.   All Confidential Information is disclosed and made available to Employee in strictest confidence.   If Employee breaches any of the terms and conditions of this Agreement, such breach will constitute a violation of the terms and conditions of the employment relationship between Employee and IFS and may result in immediate termination by IFS, including salary and other benefits.

(b)  Employee will not duplicate, remove, transfer, disclose or utilize, nor knowingly allow any other person to duplicate, remove, transfer, disclose or utilize, any Confidential Information.   All Confidential Information shall be held in strictest confidence, and not published or otherwise disclosed by Employee in any manner or to any degree except to IFS and its authorized representatives as may be required in the performance of Employee's duties for IFS and except with the prior consent of an authorized representative of IFS.

(c)  Employee shall safeguard all Confidential Information at all times and use all reasonable precautions to assure all Confidential Information is properly protected and not exposed to, or taken by, any unauthorized person.

-4-

(d)   Upon termination of Employee's employment with IFS, voluntary or involuntary, upon IFS' request or otherwise, for any reason or no reason, with or without cause, Employee shall deliver to IFS all written materials and all substances, models, mechanisms and the like containing or relating to Confidential Information, all of which written materials and other things shall be and remain the sole property of IFS.   "Written materials" shall include, but not be limited to, letters, memoranda, reports, notes, notebooks, books of account, data, formulas, drawings, prints, plans, specifications, sales and marketing records, and all other documents or writings, and all software, computer codes and computer media, tapes and recordings, and all copies thereof. Employee shall not retain copies of any Confidential Information.

4.   Employee-Conceived Information.

With respect to all Confidential Information made or conceived by Employee, either alone or with others, at any time within or without normal working hours during Employee's employment with IFS, arising out of such employment or pertinent to any field of business or research in which, during such employment, IFS is engaged or is considering engaging, including but not limited to inventions, discoveries, and formulations, and improvements, enhancements or alterations of inventions, discoveries and formulations whether made or created by Employee or by IFS, (all such Confidential Information herein referred to as "Employee-Conceived Information"), in addition to all other covenants and restrictions of this Agreement, Employee agrees that:

-5-

(a)  (i)  All  Employee-Conceived  Information, whether or not patented or patentable, shall be and remain the sole property of IFS;

(ii) Employee shall promptly disclose to an authorized representative of IFS all Employee-Conceived Information and all information in Employee's possession as to possible applications thereof to industry and other uses thereof or therefor;

(iii) Employee shall not file any patent applications relating to any Employee-Conceived Information except with the prior written consent of an authorized representative of IFS; and at the request of IFS and without expense to Employee, Employee shall execute such documents and perform such other acts as IFS deems necessary or appropriate to obtain patents on Employee-Conceived Information (or any other Confidential Information if the signature of Employee is reasonably required) to obtain patents in any jurisdiction or jurisdictions and to assign to IFS or its designees such Employee-Conceived Information and any patent applications, whether or not active, and patents relating thereto, and otherwise generally cooperate fully with IFS in connection with all patent applications, processing and protection; and

(iv) Employee shall do all the same things as set forth as to patents in paragraph 4(a)(iii) above, as to Employee-Conceived Information which is or may be the subject of copyright or trademark applications, registration and/or protection.

-6-

(b)   Employee shall not be required to assign or disclose to IFS any inventions or discoveries, developed, made or conceived prior to Employee's employment hereunder, or information relating thereto; provided, however, that all inventions and discoveries developed, made or conceived by Employee prior to Employee's employment by IFS which are owned by Employee as of the date of commencement of employment by IFS or in which Employee had an interest or right, other than those patented prior to such employment, are listed on the back of this page, and any inventions or discoveries not so patented or listed shall be deemed made or conceived during Employee's employment by IFS.  If none are listed, Employee shall place initials here: _____KR_____.

5.   <u>Other Confidential Information Agreements</u>.

Employee shall not be required to violate, and Employee agrees to respect, any valid obligations which Employee now has to prior employers or others relating to proprietary or Confidential Information and to inventions and discoveries. Employee shall, and Employee acknowledges that Employee has, supplied to IFS copies of all written agreements containing any such obligations, which agreements are listed on the back of this page, and if none are listed Employee shall be deemed to have represented that there are no such obligations.  If none are listed, Employee shall place initials here: _____K.R._____.

6.   <u>Non-Solicitation</u>.

For a period of <u>two (2)</u> years (Employee place initials here: _____K.R._____) following the termination of Employee's employment with IFS, voluntary or involuntary, upon IFS'

-7-

request or otherwise, for any reason or no reason, with or without cause, Employee shall not contact or solicit business from, or maintain or service the account of, any client or customer (hereinafter "Customer") of IFS or any person who refers clients or customers to IFS (hereinafter "Referral Source"), for any competitor of IFS or for Employee's own interest, including for any business, firm, person, partnership, corporation or other entity, as to which Employee is an employee, officer, director, agent, security holder, creditor, consultant or otherwise, regardless of the location of such competitor; provided, however, that such restriction shall relate only to Customers and Referral Sources, if (i) during the course of Employee's employment with IFS, Employee developed, facilitated, maintained and/or serviced those Customers or Referral Sources, or (ii) those Customers or Referral Sources have any facilities (at which any personnel involved in purchasing are located) in geographical areas included in any areas for which Employee had any marketing or sales responsibilities at any time within five years prior to termination of Employee's employment with IFS.  A person shall be deemed to be a Customer or Referral Source of IFS if such person has had any contact with IFS within three years prior to termination of Employee's employment with IFS even if such contact has not resulted in sales.  It is recognized and acknowledged by Employee that due to the nature of Employee's work and the scope of IFS sales and product markets, it is within the legitimate business interests of IFS to be so protected against such activities by Employee without limit as to geographical area and that the restriction period and area in this paragraph is

-8-

reasonable and will not interfere with Employee's future employment opportunities.

   7.    Non-Solicitation of IFS Employees.

         Employee shall not assist Employee's successor employer or any other entity in employment solicitation or recruiting any employee who had worked for IFS during any time when Employee worked for IFS.  Such assistance includes identifying to such successors employees of IFS who have special knowledge regarding IFS' areas of interest in present or future research and development, technical data, commercial plans and strategies, product manufacture, marketing, selling and servicing; or commenting about the quantity or quality of work or personal characteristics of any person still employed at IFS.  Employee shall not provide such information to prospective successor employers in any interview preceding possible employment.  It is agreed that damages under this paragraph would be difficult to determine and calculate and for that reason, for each person about whom it is determined that Employee has provided information in violation of this paragraph, liquidated damages shall be paid by Employee to IFS in the amount of base salary of each such person at IFS for one year preceding Employee's providing the information.

   8.    General Agreements Relating to Restrictions.

         (a)  Employee represents and agrees that Employee has read and fully understands Employee's duties and obligations as set forth in this Agreement, but recognizes the legitimate business interests of IFS and represents that such duties and obligations of Employee would not unduly restrict or curtail Employee's legitimate

-9-

efforts to earn a livelihood following any termination of Employee's employment with IFS.

(b) If any of the covenants or restrictions provided in this Agreement are determined to be invalid or unenforceable for any reason, such determination shall not affect the remaining terms, provisions or paragraphs of this Agreement which shall continue to be given full force and effect, and if such invalidity or unenforceability relates to the duration of the covenant or restriction or the geographical area included therein, the parties hereby specifically agree that the court making such determination shall modify the duration and/or geographical area of such covenant or restriction and/or delete such specific terms or phrases which the court shall deem necessary to permit enforcement of such covenant or restriction in such modified form, and such covenant or restriction shall be enforced in such modified form. Should any court find any covenant or restriction invalid or unenforceable, or enforceable only in modified form, any such finding shall apply only in the jurisdiction of such court and shall not serve to alter or amend this Agreement in any other jurisdiction.

(c) If Employee violates any covenant or restriction in this Agreement, IFS will suffer irreparable injury and damage. Therefore, IFS will be entitled to equitable relief (including but not limited to injunctions and accountings) against Employee to prevent a breach of this Agreement or any part of it, and to secure its enforcement, and IFS may withhold compensation

-10-

and benefits from Employee if Employee fails to comply with any provision contained in this Agreement.

(d)   If Employee violates any provision of this Agreement containing a time period, such period shall be extended by an amount of time equal to the period during which Employee violated that provision.

9.   NO GUARANTEED EMPLOYMENT.

THIS AGREEMENT DOES NOT GUARANTEE CONTINUATION OF EMPLOYMENT FOR ANY PERIOD AFTER THE DATE OF COMMENCEMENT OF EMPLOYMENT.   IFS AND EMPLOYEE RESERVE THE RIGHT TO TERMINATE EMPLOYMENT AT ANY TIME FOR ANY REASON OR NO REASON.   THIS AGREEMENT SHALL NOT BE CONSTRUED AS A CONTRACT OF EMPLOYMENT FOR ANY TERM AND SHALL NOT VEST ANY RIGHTS IN EMPLOYEE OR CREATE ANY RELATIONSHIP BETWEEN EMPLOYEE AND IFS OTHER THAN THAT OF EMPLOYMENT AT WILL.

10.   Survival.

Except as specifically set forth above as to time limitations, the obligations and duties of Employee hereunder shall be in full force and effect not only during Employee's employment with IFS, but shall survive termination of this Agreement and remain in full force and effect thereafter whatever the reason for termination of such employment, voluntary or involuntary, upon IFS' request or otherwise, for any reason or no reason with or without cause.

11.   Miscellaneous.

(a)   This Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania,

-11-

notwithstanding that the future employment of Employee may be in a state other than Pennsylvania.

(b)  Any notices required or permitted pursuant to this Agreement shall be sufficient if sent by IFS by certified mail, postage pre-paid, to Employee's then-current residential address as shown in the employment records of IFS, and if sent by Employee, then by certified mail, postage pre-paid to the offices of IFS located at 400 Orrton Avenue, P.O. Box 1053, Reading, Pennsylvania 19603, or the then current address of IFS if known by Employee to be different.  All notices shall be effective on the third business day following the mailing of such notice.

(c)  The waiver by IFS of a breach by Employee of any provision or covenant of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach of a similar or different nature by Employee.

(d)  The captions of the paragraphs and provisions of this Agreement are for convenience only and shall not affect in any way the meaning or interpretation of this Agreement or any of the provisions hereof.

(e)  This Agreement constitutes the entire and only understanding and agreement between the parties with respect to the subject matter hereof, written or oral, and may be amended only by a writing signed by both of the parties hereto.  All prior or contemporaneous understandings, discussions or agreements with respect to such subject matter, written or oral, are expressly superseded by this Agreement.

-12-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

IFS INDUSTRIES, INC.

By: _____

‾‾‾Vice President - Finance‾‾‾,
**Authorized Representative**

_____

‾‾‾Kevin J. Rodeck‾‾‾, **Employee**

**Title:** ‾‾Territory Manager‾‾

_____

**Witness**

-13-

EMPLOYEE STATEMENT
RE KNOWLEDGE OF ENVIRONMENTAL COMPLIANCE

Employee name: _Kevin Robeck_____

INSTRUCTIONS

    1.  Please read the statement below, write your answer to the question, and sign the form.

    2.  If you are aware of a potential problem, include in your answer when you became aware of it and what if anything you tried to do about it.  Attach additional pages if necessary.

    3.  Your answers are necessary to help IFS check whether it is complying with law, as required by IFS policy, and will be reviewed by IFS attorneys who will provide the company with relevant legal advice.   Therefore you should treat what you say here as confidential, and not discuss it with anyone outside the company.

STATEMENT

    I have received and am familiar with the IFS Environmental Management Manual. I am not aware of any actual or possible failure by IFS to comply with either environmental laws or the IFS environmental policy, except as noted below.  (If none, write "none".)

        Signed: _Kevin J. Robeck_____

        Date: _4/28/96_____

P:\CLR\12\75\3149\MISC\i&empst.02

Last revised--January 24,  1996